UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

FABRIZIO DELLA POLLA,

      Plaintiff,

                                               CASE NO.

vs.

ALEXANDER PALENCIA,

      Defendant.

_____/

## COMPLAINT

Fabrizio Della Polla sues Alexander Palencia based on the following facts:

1.    When they first met, Alexander Palencia was an aquaculture feed vendor in Miami, and Mr. Della Polla owned and ran a major animal nutrition importation and distribution business in Venezuela.  Mr. Della Polla started purchasing fish feed from Mr. Palencia, and these orders caused Mr. Palencia's business to grow rapidly.   Eventually, Mr. Palencia's entire business was with Mr. Della Polla.

2.    As both businesses grew and became more dependent upon each other, Mr. Della Polla invited Mr. Palencia to join him as a partner in the animal food business.  First, Mr. Della Polla agreed to purchase all of his fish feed from Mr. Palencia, and eventually, Mr. Della Polla decided to create a logistics base in the United States to serve his business in Venezuela.   Because Mr. Della Polla provided the financing and brought all of the customers to the business, Mr. Della Polla and Mr. Palencia agreed that Mr. Della Polla

would own 80% of any businesses they created, and Mr. Palencia would own 20% of the businesses.

3.   After the businesses became extremely profitable, Mr. Palencia suggested the two men use some of the profits to invest in a real estate development project in Brooklyn, New York. After making an arrangement with a real estate development company called Property Markets Group ("PMG"), Mr. Palencia and Mr. Della Polla decided to purchase several parcels of land in an upcoming area near the Gowanus Canal, rezone the properties, build residences on the properties, and rent or sell the homes.  As with the other businesses, Mr. Della Polla was providing the bulk of the financing, so the two men agreed Mr. Della Polla would own 80% of the investment and be entitled to his proportionate share of any profits.

4.   At the time, Mr. Della Polla did not realize Mr. Palencia never intended to honor his promise to make Mr. Della Polla a partner.  Rather, even though Mr. Palencia took money from their companies to fund the investment, and even though he told Mr. Della Polla he would include him in the ownership structure, Mr. Palencia ultimately structured the ownership entities so they did not include Mr. Della Polla.

5.   In the meantime, to keep Mr. Della Polla at bay, Mr. Palencia provided repeated oral and email updates about the project, repeated assurances that Mr. Della Polla was a partner, and repeated assurances that the investment would benefit both men.

6.   By all accounts, the investment has paid off handsomely, but Mr. Della Polla has received nothing.

7.   After a period of time, Mr. Palencia refused to answer Mr. Della Polla's questions about the investment including among other things: how the investment was structured, how much

money he and Mr. Palencia invested, whether other individuals or entities invested, how much money was returned to investors, whether there was a profit, and the current state of the investment and the project.

8.   After being repeatedly ignored, Mr. Della Polla retained a lawyer to contact Mr. Palencia and to demand an accounting of the investment and access to the relevant books and records of the partnership.

9.   In response to this request, Mr. Palencia's lawyers wrote back and said: "[Mr.] Della Polla is not a partner in any of Alexander Palencia's real estate ventures in New York or elsewhere… ."  They added that: "To be clear, Mr. Della Polla did not invest any funds in the "Carroll Street project and other projects… ."

10.  Mr. Palencia's contemporaneous emails and promises completely contradict his lawyers' assertion.

11.  In light of this letter from Mr. Palencia's lawyers, it is now clear that Mr. Palencia has defrauded Della Polla and breached his fiduciary duties as a partner.  Consequently, Mr. Della Polla is bringing this lawsuit to regain what is rightfully his.

**Parties, Jurisdiction, and Venue**

12.  Fabrizio Della Polla is resident of Italy.

13.  Alexander Palencia is a resident of Miami, Florida.

14.  This Court has subject jurisdiction over this claim because Mr. Della Polla is a resident of Italy and Mr. Palencia is a resident of Miami-Dade County, Florida (i.e., the parties are from different states), and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

THE LAW OFFICE OF STEPHEN JAMES BINHAK, P.L.L.C.,
1221 Brickell Ave., Suite 2010, Miami, FL  Tel. (305) 361.5500, Fax (305) 428.9532

15. Venue is proper in this court because Mr. Palencia resides in this judicial district, and because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

**Mr. Della Polla and Mr. Palencia Meet and
Go Into Business Together**

16. Mr. Della Polla was a successful entrepreneur in Venezuela who concentrated his efforts on sourcing and importing animal nutrition products.  Mr. Della Polla started his business Servinaca (Servicios de Nutricion Animal, C.A.), in 2004.  One the years, the business grew to be large and profitable.

17. Prior to 2010, Mr. Della Polla met Mr. Palencia who ran a small aquaculture feed business in Miami, Florida.  Initially, Mr. Palencia sold relatively small amounts of fish feed to Mr. Della Polla.  Over time, the relationship grew and allowed Mr. Palencia's business to get larger and more profitable. Ultimately, Mr. Palencia devoted his entire business to supplying Mr. Della Polla, and Mr. Palencia derived significant profits from this arrangement.

18. As a result of this growing business relationship, Mr. Della Polla began to think of Mr. Palencia not only as a business source, but also as a trusted friend.

19. During this period, the Venezuelan Bolivar became increasingly difficult to use for trade because of political instability, price controls, and currency controls.  This situation placed considerable pressure on Mr. Della Polla's business because he was purchasing animal feed with U.S. Dollars, but selling the feed for Venezuelan Bolivars.  Mr. Palencia convinced

THE LAW OFFICE OF STEPHEN JAMES BINHAK, P.L.L.C.,
1221 Brickell Ave., Suite 2010, Miami, FL  Tel. (305) 361.5500, Fax (305) 428.9532

Mr. Della Polla that Mr. Palencia was an expert in foreign exchange and that Mr. Palencia could handle U.S. Dollar- Bolivar transactions legally and efficiently.

20.   In addition, the instability in Venezuela made it harder for Mr. Della Polla to source products, to pay for the products, and to store products in Venezuela.  Consequently, Mr. Della Polla decided he needed a logistics center in the United States to service his business in Venezuela.

21.   To address this situation, Mr. Della Polla invited Mr. Palencia to become a partner in a series of businesses.  Through these arrangements, Mr. Palencia and Mr. Della Polla would have access to dollars, animal feed, and storage facilities in the United States, and to reliable markets in Venezuela for their products.  Further, the men could take their profits in U.S. Dollars which was far more secure than holding Venezuelan Bolivars.  Mr. Della Polla was in charge of the clients and sales, and Mr. Palencia was in charge of the financial aspects of the business.

22.   Mr. Della Polla was delighted to go into business with a person he believed he could trust, with purported expertise, and with access to U.S. food sources and dollars.  In time, the business grew even larger and more profitable.

23.   To reflect the fact that Mr. Della Polla provided the original capital for the businesses and was actually responsible for all of the sales, Mr. Della Polla and Mr. Palencia agreed to split the ownership and profits 80% for Mr. Della Polla and 20% for Mr. Palencia.

24.   Partly because Mr. Palencia was in Florida and had daily access to the U.S. banks, and partly because Mr. Palencia professed to have financial knowledge and professionalism,

but mostly because Mr. Della Polla had great faith and trust in Mr. Palencia, Mr. Della Polla allowed Mr. Palencia to control all of the finances for the businesses.

25.   What Mr. Della Polla did not know until much later was that Mr. Palencia was engaged in fraud.  Although the two men had agreed to be 80/20 partners in all of the food businesses, Mr. Palencia formed companies without documenting Mr. Della Polla's actual interest.   In this way, Mr. Palencia set the stage for taking Mr. Della Polla's share of the profits without permission.  In addition, Mr. Palencia would simply take more than his 20% of the profits.

26.   Notwithstanding Mr. Palencia's fraud, Mr. Della Polla was able to increase massively sales in Venezuela, the businesses grew tremendously, profits soared, and the U.S. Dollars collected in the U.S. Bank accounts that Mr. Palencia had set up.

**Mr. Della Polla and Mr. Palencia Decide to
Invest Their Profits In Real Estate**

27.   Prior to 2012, Mr. Palencia identified a real estate investment in Brooklyn, New York.

28.   At the time, there were plans to clean and revitalize the Gowanus Canal (which was extremely polluted with industrial waste), and the land along the canal drew interest from residential developers.

29.   Through the help of PMG, Mr. Palencia identified an investment in properties along the Gowanus Canal (on Carroll Street and on Nevins Street and on Third Street).  The original idea was to purchase the properties to create an assemblage, convert the zoning for the properties from in dustrial to residential, build residences, and rent the residences.   In his description of the investment, Mr. Palencia explained: "The project includes the rezoning of these lots, the application for tax abatements and the construction of approximately 400

rental units."   The investment description indicates that three companies would be spearheading the project: Blackforest Real Estate Advisors, LLC (Mr. Palencia's firm); InverMex Advisors, LLC; and Property Markets Group. A copy of the Investment Description is attached as Exhibit 1.

30.   In 2012, Mr. Palencia suggested to Mr. Della Polla that the two men use the profits from their feed business to invest in the effort to purchase, rezone, develop, and rent the resulting residential apartments (the "Brooklyn Real Estate Deal").  Mr. Della Polla agreed, and the men decided to pursue the Brooklyn Real Estate Deal (initially through Blackforest Real Estate Advisors, LLC, and subsequently through any other entities necessary and appropriate to further the development and the investment.

31.   On April 21, 2012, Mr. Palencia sent an email to Mr. Della Polla to summarize the business terms of the Brooklyn Real Estate Deal.  By repeatedly using the word "we" to describe the investment, Mr. Palencia unequivocally expressed the fact that the two men were investing jointly as partners.

32.   According to Mr. Palencia, the Land was worth $10 million, the bank would be providing a $4.5 million loan, Mr. Palencia and Mr. Della Polla would invest $4.4 million, and PMG would invest $1.1 million (**we put in 4,400,000**) (emphasis added).   Mr. Palencia predicted: "In 36 to 48 months *we* can sell the project (without building) for approximately $18.9 million."   He added: "**If *we* build it, *we* need to raise an additional 47,500,000.00** for the construction in addition to the 10MM of the land (there is already a bank ready to give the financing) The final cost of the project is around 57,500,000.00 and the sale price

around $110,000,000.00 based on a price of $750 / ft in today's market. This is the big

leagues dad. (emphasis added)"  A translation of the full email follows:

> From: Alexander Palencia <apalencia@yahoo.com>
> Date: April 21, 2012 00:32:06 GMT + 2
> To: Fabrizio Dellapolla <fdp.servinaca@gmail.com>
> Subject: 420-430 Carroll
>
> Fabrizio,
> To summarize the business of Gowanus (Brooklyn)
> Land is worth: $ 10,000,000.00
> Bank finances 4,500,000.00
> We put 4,400,000.00
> Partners (PMG) puts 1,100,000.00
> In 36 to 48 months we can sell the project (without building) for approximately $18,900,000.00.
> If we build it, we need to raise an additional 47,500,000.00 for the construction in addition to the 10MM of the land (there is already a bank ready to give the financing)
> The final cost of the project is around 57,500,000.00 and the sale price around $110,000,000.00 based on a price of $ 750 / ft in today's market.
> This is the big leagues dad.
>
> Alexander Palencia
> apalencia@yahoo.com
> T: + 1-305-595-4619
> F: + 1-305-468-6439
> M: + 1-305-726-4444
> Skype: divendi

A copy of the email is attached as Exhibit 2.

33.   Starting in May 2012, Mr. Palencia caused Agromix (a company owned 80% by Mr. Della

Polla and 20% by Mr. Palencia) to make a series of payments to fund at least part of the

men's joint investment in the Brooklyn Real Estate Deal.

34.   On May 1, 2012, Mr. Palencia caused a transfer to be made from the Bank of America

Account of Agromix in the amount of $5,000.00 to a New York real estate attorney, Sandor

Kraus.  Mr. Palencia retained Mr. Kraus to provide legal assistance with the Brooklyn Real Estate Deal.  The ledger which reflects the transfer notes the payment as a joint payment from Mr. Palencia and Mr. Della Polla as "legal retainer/ Brooklyn Deal."  A copy of the ledger is attached as Exhibit 3.

35.    On May 22, 2012, Mr. Palencia sent an email to Mr. Della Polla to introduce Mr. Della Polla to PMG, "our partners in the Brooklyn project."  Again, the use of the word "our" unequivocally expressed the fact that the two men were investing jointly as partners.  The email included links to websites which described PGM and their investment portfolio.  A translation of the full email follows:

> From: Alexander Palencia <apalencia@yahoo.com>
> Date: May 22, 2012 13:53:48 GMT + 2
> To: Fabrizio Dellapolla <fdp.servinaca@gmail.com>
> Subject: Propery + Markets + Group
>
> Fabrizio,
> **These are our partners in the Brooklyn project**
> http://propertymg.com/
> In this link is the portfolio of what they have done:
> http://propertymg.com/portfolio/?preselect=current#
> Slds

A copy of the email is attached as Exhibit 4 (emphasis added).

36.    On May 15, 2012, Mr. Palencia caused a second transfer to be made from the Bank of America Account of Agromix in the amount of $375,000.00.  The ledger which reflects the transfer notes the payment as a joint payment from Mr. Palencia and Mr. Della Polla for "Brooklyn Deal 420-430 Carroll Street (Gowanus)." Exhibit 3.

37.    On May 24, 2012, Mr. Palencia caused a third transfer to be made from the Bank of America Account of Agromix in the amount of $80,000.00.  The ledger which reflects the

transfer notes the payment as a joint payment from Mr. Palencia and Mr. Della Polla for "Carroll Street Holdings, LLC (Rezoning Deposit)." Exhibit 3.

38. On June 13 2012, Mr. Palencia caused a fourth transfer to be made from the Bank of America Account of Agromix in the amount of $5,025.00.  The ledger which reflects the transfer notes the payment as a joint payment from Mr. Palencia and Mr. Della Polla for "Sandor Kraus Legal Retainer/ Brooklyn Deal." Exhibit 3.

39. On June 13 2012, Mr. Palencia caused a fifth transfer to be made from the Bank of America Account of Agromix in the amount of $21,000.00.  The ledger which reflects the transfer notes the payment as a joint payment from Mr. Palencia and Mr. Della Polla for "Brooklyn Advisory Services." Exhibit 3.

40. On June 13 2012, Mr. Palencia caused a sixth transfer to be made from the Bank of America Account of Agromix in the amount of $21,000.00.  The ledger which reflects the transfer notes the payment as a joint payment from Mr. Palencia and Mr. Della Polla for "Brooklyn Travel Expenses." Exhibit 3.

41. After making these payments, Mr. Palencia formed the entity that would actually participate in the Brooklyn Real Estate Deal, Blackforest Real Estate Advisors, LLC. Specifically, on June 19, 2012, Mr. Palencia created Blackforest Real Estate Advisors, LLC, as a Florida limited liability company with an address at a post office box.   Mr. Palencia and Nadyimir Alessio were the original managers of the company, and Mr. Palencia was the original registered agent.

42. On June 29, 2012, Mr. Palencia caused a seventh transfer to be made from the Bank of America Account of Agromix in the amount of $410,000.00.  The ledger which reflects the

transfer notes the payment as a joint payment from Mr. Palencia and Mr. Della Polla for "Brooklyn Deal Nevis Street Down Payment." Exhibit 3.

43. On July 9, 2012, Mr. Palencia sent an email to Mr. Binaggia and Mr. Della Polla with an appraisal for the 420 and 430 Carroll Street parcels.   Mr. Palencia explained that the appraisal confirmed that they were buying the properties for the same price as another appraisal they received— $9 million.  He also noted that once the properties were rezoned, they would be worth $25 million.  Mr. Palencia wrote: "We are on the good way."  Again, by using the word we, Mr. Palencia unequivocally expressed the fact that he and Mr. Della Polla were investing jointly as partners.

> To:  Pedro  Binaggia  [pedrobinaggia@gmail.com];  Fabrizio  Dellapolla
> [fdp.servinaca@gmail.com]
> From: Alexander Palencia [apalencia@yahoo.com]
> Sent: Fri 7/9/2012 2:48:08 PM (UTC)
> Subject: FW: Carroll
> 420-430 Carroll Street Appraisal 7-25-2012.pdf
> Attached is a copy of the 420-430 Carroll Street appraisal. There are two interesting points, first that the price of USD 9MM that we are paying is the same value for which the property was appraised by the company that we hired.  And the second point is that once re-zoned the company estimated the price in USD 25MM.
> **We are on the good way!!**
> Alexander Palencia
> apalencia@yahoo.com
> T: + 1-305-595-4619
> F: + 1-305-468-6439
> M: + 1-305-726-4444
> Skype: divendi
>
> From: Richard Lam [mailto: rlam@propertymg.com]
> Sent: Friday, September 07, 2012 3:14 AM
> To: Alexander Palencia (apalencia@yahoo.com)
> Cc: Peter Moore (pmaarch@gmail.com); Kevin Maloney
> Subject: FW: Carroll
> Here it is

A copy of the email is attached as Exhibit 5 (emphasis added).

44.     On July 10, 2012, Mr. Palencia caused an eighth transfer to be made from the Bank of
        America Account of Agromix in the amount of $200,000.00.  The ledger which reflects the
        transfer notes the payment as a joint payment from Mr. Palencia and Mr. Della Polla for
        "Brooklyn Deal 420-430 Carroll Street (Gowanus)." Exhibit 3.

45.     With the money flowing, Mr. Palencia shared with Mr. Della Polla financial information
        about the Brooklyn Real Estate Deal.

46.     On July 26, 2012, Mr. Palencia forwarded Mr. Della Polla an email with a spread sheet
        attached.   Mr. Palencia received the spreadsheet from Richard Lam, a partner at PMG.
        According to Mr. Lam, the spreadsheet described two projects in Brooklyn: "projected cash
        outlays are [sic] on a monthly basis.  The spreadsheet indicates the projects would require
        $14 million of funding from May through December 2012.  A translation of the full email
        follows:

                From: apalencia@yahoo.com
                Date: July 26, 2012, 16:38:51 GMT+2
                To: Fabrizio Della Polla <fdp.servinaca@gmail.com>
                Subject: Fw:  Carroll and Nevins
                Answer to: apalencia@yahoo.com

                Sent via BlackBerry from T-Mobile

                From: Richard Lam <rlam@propertymg.com>
                Date: Thu, 26 Jul 2012 14:03:41 +0000
                To: Alexander Palencia (apalencia@yahoo.com)<apalencia@yahoo.com>; Kevin
                Maloney<kmaloney@propertyMG.com>; Peter Moore
                (pmaarch@gmail.com)<pmaarch@gmail.com>
                Subject: Carroll and Nevins

THE LAW OFFICE OF STEPHEN JAMES BINHAK, P.L.L.C.,
1221 Brickell Ave., Suite 2010, Miami, FL  Tel. (305) 361.5500, Fax (305) 428.9532

I have attached  for both projects (separate and combined) the projected cash outlays are on a monthly basis.

A copy of the email and the spreadsheet is attached as Exhibit 6.

47.   Several hours later on July 26, 2012, Mr Palencia sent an email to Mr. Della Polla with the

wiring instructions for payments to the Brooklyn Real Estate Deal.

> From: Alexander Palencia <apalencia@yahoo.com>
> Date: July 26, 2012 23:43:06 GMT + 2
> To: Fabrizio Dellapolla <fdp.servinaca@gmail.com>
> Cc: Fabrizio Dellapolla <fdp.servinaca@gmail.com>
> Subject: Brooklyn Wire Transfer Information
>
> Fabrizio
> Instructions for transferring funds for the Brooklyn project are:
> Wire Transfer Information

| | |
|---|---|
| Beneficiary Bank | Bank of America NA |
| | 11205 South Dixie Highway |
| | Miami, FL 33157 - USA |
| Beneficiary: | Blackforest Real Estate Advisors LLC |
| | 6619 South Dixie Highway |
| | PMB 378 |
| | Miami, FL 33143 |
| SWIFT | BOFAUS3N |
| ABA No. | 26009593 |
| Account No.: | 229043554747 |
| Ref.: | Brooklyn Carroll Street Development |

> Alexander Palencia
> apalencia@yahoo.com
> T:  +1-305-595-4619
> F:  +1-305-468-6439
> M: +1-305-726-4444
> Skype:  divendi

A copy of the email is attached as Exhibit 7.

48.   Around this time, Mr. Della Polla asked his long time Venezuelan lawyer, Pedro Binaggia,

to act as his counsel for the deal.  For this reason, Mr. Della Polla asked Mr. Palencia to

send all details of the investment to Mr. Binaggia for review with a copy to Mr. Della Polla. Ultimately, Mr. Della Polla and Mr. Palencia invited Mr. Binaggia to become a partner in the Brooklyn Real Estate Deal, and he accepted.

49. On July 27, 2012, Mr. Palencia sent four emails to Mr. Binaggia and he copied Mr. Della Polla on each one.

50. In the first email, Mr. Palencia sent Mr. Binaggia and Mr. Della Polla contained an email with an attached investment presentation regarding the Brooklyn Real Estate Deal.  The presentation provided a three page description of the project.  In particular, the presentation identified Blackforest Real Estate Advisors as the co-sponsor, explained the basic investment strategy, identified the key members of the team, and set forth basic financial information.  A translation of the full email follows:

From: Alexander Palencia <apalencia@yahoo.com>
Date: July 27, 2012 13:37:24 GMT + 2
To: Pedro Binaggia <pedrobinaggia@gmail.com>
Cc: Fabrizio Della Polla <fdp.servinaca@gmail.com>
Subject: Executive Summary / Brooklyn

Pedro,
Attached a summary of the presentation, the most relevant aspects were condensed into three pages.
Regards
Alex

A copy of the email is attached as Exhibit 8.

51. In the second email, Mr. Palencia sent to Mr. Binaggia and Mr. Della Polla contained an email with a spreadsheet attached.  Mr. Palencia explained that the spreadsheet outlined the capital requirements for the Brooklyn Real Estate Deal as of July 28, 2012.  According to this spreadsheet, Blackforest Real Estate Advisors and Property Market Group would

purchase the Nevins and Carroll properties for $14 million with Blackforest having an 80%

interest in the project and PMG having a 20% interest.   A translation of the full email

follows:

> From: Alexander Palencia <apalencia@yahoo.com>
> Date: July 27, 2012 13:52:40 GMT + 2
> To: Pedro Binaggia <pedrobinaggia@gmail.com>
> Cc: Fabrizio Della Polla <fdp.servinaca@gmail.com>
> Subject: Capital Requirements as of 07.27.2012
>
> Attached is a  table of capital requirements, updated on 07.28.2012

A copy of the email is attached as Exhibit 9.

52.   In the third email, Mr. Palencia sent a message with another spreadsheet attached.   This

email explained the spreadsheet identified the added value at each step of the development.

According to the spreadsheet, the original total purchase price of the properties was $25

million.   After rezoning, the property would be valued at over $50 million, and the

projected sales proceeds would be $276 million.  A translation of the full email follows:

> From: Alexander Palencia <apalencia@yahoo.com>
> Date: July 27, 2012, 14:00:13 GMT + 2
> To: Pedro Binaggia <pedrobinaggia@gmail.com>
> Cc: Fabrizio Della Polla <fdp.servinaca@gmail.com>
> Subject: value added calculation
>
> Pedro,
> attached in excel is the detail that was used to calculate the added value to the
> project in each of the steps.
> The graph of the presentation originated from this table.
> alex

A copy of the email is attached as Exhibit 10.

53.   In the fourth email, Mr. Palencia sent a message with an attachment that provided an

investment  summary  for  three  investments  at  the  development  level  and  the  holding

company level: Carroll Street, Kevin Street, and C&N Street.  According to this summary, Blackforest invested a total of more than $12 million in each project at the development level, Carroll Street Development invested $4.4 million in Carroll Street Holding, and PMG invested $2.8 million in the 3 projects at the holding company level.  A translation of the full email follows:

> From: Alexander Palencia <apalencia@yahoo.com>
> Date: July 27, 2012 14:16:08 GMT + 2
> To: Pedro Binaggia <pedrobinaggia@gmail.com>
> Cc: Fabrizio Della Polla <fdp.servinaca@gmail.com>
> Subject: Final calculation of profitability
>
> I'll call later to discuss it,
> sdls

A copy of the email is attached as Exhibit 11.

54.    On July 31, 2012, Carroll Street Holdings, LLC executed a Sale Contract for the properties located at 420 and 430 Carroll Street in Brooklyn.  Though this contract, Carroll Street Holdings, LLC agreed to pay $9,000,000.00 for the properties with a $450,000.00 deposit due upon signing the contract. *See* Exhibit 12.

55.    Mr. Palencia's and Mr. Della Polla's ownership interest in the deal derived from their ownership in Blackforest Real Estate Advisors, LLC.  Specifically, Mr. Della Polla owned 80% of Blackforest Real Estate Advisors, LLC and Mr. Palencia owned 20% of Blackforest Real Estate Advisors, LLC.  Blackforest Real Estate Advisors, LLC owned 100% of a company called Carroll Street Development, LLC, a New York limited liability company.  Carroll Street Development, LLC owned 80% of Carroll Street Holdings, LLC,

a New York limited liability company, and Carroll Street Holdings, LLC owned 100% of

the two properties.  *See* Exhibit 12.  The following chart shows the ownership:

Palencia (20%); and
Della Polla (80%)

⬇

Blackforest Real Estate Advisors, LLC (100%)

⬇

Carroll Street Development, LLC (80%);

⬇

Carroll Street Holdings (100%)

⬇

420 and 430 Carroll Street Parcels

56.   On August 1, 2012, Mr. Della Polla sent two emails to Mr. Binaggia with a copy to Mr.

Della Polla regarding the closing of the transaction for 420 and 430 Carroll Street.

57.   In the first email, Mr. Palencia introduced Mr. Kraus and provided wire instructions for

funding the transactions.  The translated email follows:

> To: Pedro Binaggia [pedrobinaggia@gmail.com]
> Cc: Fabrizio Dellapolla [fdp.servinaca@gmail.com]
> From: Alexander Palencia [apalencia@yahoo.com]
> Sent: Wed 1/8/2012 1:01:04 PM (UTC)
> Subject: Scrow Account
> Domestic Wiring Instructions Hudson Valley.doc
> Good morning Pedro,
> Sandor Krauss is the attorney that represents us in NY for all transactions,
> he specializes in real estate.  With Sandor we have already made several
> purchase and sale and rental transactions; he will be the escrow agent for
> the closing of the trade at 420-430 Carroll Street and very probably for
> Nevins in December.
> Below are the coordinates to fund the account. The final and exact
> amounts do not yet have them at this time, I remain pending have them at
> the end of the day or first thing tomorrow.
> Regards
> Alex
> Alexander Palencia
> apalencia@yahoo.com

THE LAW OFFICE OF STEPHEN JAMES BINHAK, P.L.L.C.,
1221 Brickell Ave., Suite 2010, Miami, FL  Tel. (305) 361.5500, Fax (305) 428.9532

T: + 1-305-595-4619
F: + 1-305-468-6439
M: + 1-305-726-4444
Skype: divendi

From: Sandor Krauss [mailto: Sandor@krausslegal.com]
Sent: Tuesday, July 31, 2012 10:31 AM
To: 'Alexander Palencia'
Subject: RE: Scrow Account
Sandor D. Krauss, Esq
1040 Avenue of the Americas, Suite 1101
New York, NY 10018
Tel: 212.764.3377
Fax: 212.656.1543

From: Alexander Palencia [mailto: apalencia@yahoo.com]
Sent: Tuesday, July 31, 2012 10:29 AM
To: Sandor Krauss
Subject: Scrow Account
Hi Sandy,
I will start funding of scrow account for closing on Carroll. Please send
me wire instructions.
Regards
Alex
Alexander Palencia
apalencia@yahoo.com
T: + 1-305-595-4619
F: + 1-305-468-6439
M: + 1-305-726-4444
Skype: divendi

A copy of the email is attached as Exhibit 13.

58.   In the second email, Mr. Della Polla sent the documents related to the closing for the 420

and 430 Carroll Street transaction.   He noted that these documents did not relate to the

Nevins Street property transaction which would close in December 2012.   Mr. Palencia

further explained that their lawyer in New York was willing to accept into his escrow

account funds from the investors for the purchase.   Once again, Mr. Palencia explained that

the attorney in NY was representing "us" to reflect the fact that Mr. Paencia and Mr. Della

Polla were partners.  The translated email says:

> Cc: Fabrizio Della Polla [fdp.servinaca@gmail.com]
> To: Pedro Binaggia [pedrobinaggia@gmail.com]
> From: Alexander Palencia [apalencia@yahoo.com]
> Sent: Wed 1/8/2012 1:26:11 AM (UTC)
> Subject: Carroll Street Legal Docs Portfolio
> Project Brooklyn Legal Document Portfolio.pdf
> Untitled attachment 06732.txt
> Hello Pedro,
> Attached I send you a PDF file with a copy of all the legal documents related to
> the purchase of 420 and 430 Carroll Street that we will close on August 13 or 14,
> these documents do not include the purchase of Nevins Street that we will close
> in early December.   These documents reflect land costs, and do not include
> closing costs, tax (doc stamps), etc.   I will send you a breakdown of the final
> amounts in the coming days.
> **I spoke to the attorney representing us in NY, and he indicated that there is
> no problem in receiving funds from investors directly in the 'escrow account'**
> Please take a look at the documents and we'll have a chat tomorrow morning.
> Regards
> Alex
> Alexander Palencia
> apalencia@yahoo.com
> + 1-305-726-4444

A copy of this Email is attached as Exhibit 14.

59.  On August 10, 2012, Mr. Palencia caused a ninth transfer to be made from the Bank of

America Account of Agromix in the amount of $1,000,000.00.   The ledger which reflects

the transfer notes the payment as a joint payment from Mr. Palencia and Mr. Della Polla for

"420-430 Carroll Street Closing." Exhibit 3.

60.  On August 10, 2012, Mr. Palencia forwarded to Mr. Binaggia and Mr. Della Polla an email

that he received from a lawyer in Mr. Kraus's office in New York, Rachel Isaacson.   Ms.

Isaacson reported that Mr. Kraus' firm had received $3,000,000.00 from Mirabella Ocean

Corp., a Panamanian company, to be held in Escrow for the Brooklyn Real Estate Deal.

The full email follows:

> From: Alexander Palencia <apalencia@yahoo.com>
> Date: August 10, 2012, 16:36:54 GMT+2
> To: Pedro Binaggia <pedrobinaggia@gmail.com>
> Cc: Fabrizio Della Polla <fdp.servinaca@gmail.com>
> Asunto: Fwd:  Escrow Account Funding USD 3,000,000.00
>
> Begin forwarded message:
> From: Rachel Isaacson <rachel@krausslegal.com>
> Subject: RE: Escrow Account Funding
> Date: August 10, 2012 10:21:53 AM EDT
> To: Alexander Palencia <apalencia@yahoo.com>, Sandor Krauss
> <Sandor@krausslegal.com>
>
> Dear Alex,
>
> On August, 8th we received a wire totaling $3,000,000 from Mirabelle Ocean
> Corp.  Attached is the confirmation of receipt from our bank.  Please let me know
> if you need anything further.  Thank you.
> Best regards,
> Rachel Isaacson, Esq.
> The Law Offices of Sandor D. Krauss, P.C.
> 1040 Avenue of the Americas
> Suite 1101
> New York, New York 10018
> Tel:  212.764.3377
> Fax:  212.656.1543

A copy of the email is attached as Exhibit 15.

61.   On September 7, 2012, Mr. Palencia caused a tenth transfer to be made from the Bank of

America Account of Agromix in the amount of $600,000.00.  The ledger which reflects the

transfer notes the payment as a joint payment from Mr. Palencia and Mr. Della Polla for

"Nevins Street Brooklyn 2nd Deposit."  Exhibit 3.

62.  On September 8, 2012, Mr. Palencia sent Mr. Binaggia and Mr. Della Polla an internet link to the legal documents relating to the purchase of 420 and 430 Carroll Street in Brooklyn. A copy of this email is attached as Exhibit 16.

63.  On September 14, 2012, Carroll Street Holdings purchased for $9 million the property located at 420 and 430 Carroll Street in Brooklyn.   A copy of the deed is attached as Exhibit 17.  In connection with this purchase, Carroll Holdings borrowed $3 million from The Berkshire Bank, and granted the Berkshire bank a $3 million mortgage against the property located at 420 and 430 Carroll Street in Brooklyn. A copy of the mortgage is attached as Exhibit 18.

64.  On October 11, 2012, Mr. Palencia received sketches of development concepts for the Nevins and Carroll Street properties from Richard Lam at PGM.  On October 12, 2012, Mr. Palencia forwarded these sketches to Mr. Della Polla to keep Mr. Della Polla apprised of the investment. A copy of this email is attached as Exhibit 19.

65.  As of December 6, 2012 Nevins Street Holding Company, LLC purchased for $14 million the property located at 300-344 Nevins Street in Brooklyn New York (which is adjacent to the 420-430 Carroll Street property).   In connection with this purchase, Nevins Street Holding Company, LLC borrowed $7 million from the seller, Joyce A. Kjellgren and gave her a mortgage against the property for that amount.  A copy of the Deed and Mortgage is attached as Exhibit 20.

66.  On January 15, 2013, Mr. Palencia caused an eleventh transfer to be made from the Bank of America Account of Agromix in the amount of $112,500.00.  The ledger which reflects

21
THE LAW OFFICE OF STEPHEN JAMES BINHAK, P.L.L.C.,
1221 Brickell Ave., Suite 2010, Miami, FL  Tel. (305) 361.5500, Fax (305) 428.9532

the transfer notes the payment as a joint payment from Mr. Palencia and Mr. Della Polla for "Registro Taxes NYC." Exhibit 3.

67.     On February 16, 2013, Mr. Palencia sent an email to Mr. Della Polla.   In this email, Mr. Palencia reaffirmed the business partnership between the men and how pleased he was to associate with Mr. Della Polla.  Mr. Palencia wrote:

> Dear and highly esteemed Partner,
>
> Throughout my life I have had the habit of summarizing in writing on the flight back home and together with a couple of glasses of evil came the achievements of the trip.  On occasions they have been successful and on others they have not.  But I have learned from everything, I have fond memories of all (or at least anecdotes so that in some future I can tell my daughters or grandchildren when you have them, or the children of those who accompanied me on this journey), I have analyzed where we have been one step ahead of the rest and where I screwed up.
>
> Of all the work trips that I have made since we started our business association, in this journey together that only God rules to where it will take us and where it ends; this time I will allow myself to write you a word.
>
> I am very surprised of the achievements, I am very surprised (not of your intelligence, because I know that you have plenty) of the ability to have turned an idea into a tangible event, into a fact.
>
> Without wishing to sound like I'm writing as a fagots, friendship and trust allow me to congratulate you.   Partner, take care, think, listen, analyze and then execute; you are destined for great things.  Your future is bright, take care of it.  I will have a whiskey tomorrow in your name, I am proud of what you have achieved in this universe of uncertainties and risks, I am happy to be part of that achievement and to have been able to contribute a grain of sand !!! Auguri
>
> This is in writing, because if we talked about it while drinking we would probably look like two fagots and that looks ugly at this age.
>
> A big hug, from the real ones. One thing from one friend to another, if you ever consider that our business association does not work, you tell me straight ahead and looking into my eyes that I will appreciate it.  I would never forgive, nor would I forgive myself for sacrificing our friendship for a ticket.  Because believe me the reals come and go, but the friends to trust and count are few and I consider you one of those.

> You are loved and esteemed. We will celebrate this one day watching
> the sunset together with our families, children in Sicily, write it !!!

A copy of the email is attached as Exhibit 21.

68.   Mr. Palencia was obviously pleased with the partnership because he had used the men's

money for a growing assemblage of property.

69.   On May 29, 2013, Mr. Palencia sent an email to Mr. Binaggia and Mr. Della Polla to report

on plans to rearrange the ownership structure of the Brooklyn Real Estate Deal to

accommodate the growing project.   Mr. Palencia attached a proposed corporate structure

for the Brooklyn Real Estate Deal which had now expanded to include a project on Nevins

Street and a project on Third Street.  According to the proposed structure, the Nevins Street

Development was to be owned by a new Blackforest entity (Blackforest Nevins Street),

and the Third Street Development would be owned by another new Blackforest entity

(Blackforest Third Street).  Foreign trusts would own all of the Blackforest entities.  As a

result, Mr. Palencia attached a form for a model New Zealand Trust and an explanation of

certain trust fees and expenses for various countries so Mr. Binaggia and Mr. Della Polla

could evaluate their investment.  A copy of the translated email is below:

> From: Alexander Palencia <apalencia@yahoo.com>
> Date: May 29, 2013 22:20:52 GMT + 2
> To: Pedro Binaggia <pedrobinaggia@gmail.com>
> Cc: Fabrizio Della Polla <fdp.servinaca@gmail.com>
> Subject: Fwd: Trust Deed / AMSTERDAM TRUST COMPANY
> Pedro
> - Attached is a proposed structure for Brooklyn.
> - NZ trust model
> - Amsterdan Trust fees
> Alex
> Alexander Palencia
> apalencia@yahoo.com

+ 1-305-726-4444

A copy of the email is attached as Exhibit 22.

70.   On June 11, 2013, Mr. Palencia sent three emails to Mr. Binaggia and Mr. Della Polla.

71.   In the first email, Mr. Palencia provided a PowerPoint presentation.   Mr. Palencia

explained the presentation provided recommendations from an accountant and a lawyer for

restructuring the Brooklyn Real Estate Deal so that it was more tax efficient, more

confidential, and easier to transfer.  Although the two proposals in the presentation varied,

3 Blackforest entities would be the sponsors of the Brooklyn Real Estate Deal and the

ultimate profits would flow to a foreign trust or foreign partnership.   A copy of the

translated email is below:

From: Alexander Palencia <apalencia@yahoo.com>
Date: June 11, 2013 02:11:36 GMT + 2
To:  Pedro  Binaggia  <pedrobinaggia@gmail.com>,  Fabrizio  Della  Polla
<fdp.servinaca@gmail.com>
Subject: Investment Structure

Hello Pedro
Based on what we discussed, attached a presentation of how it is more efficient to structure
the project in Brooklyn, Structure II was the one recommended by the accountant and the
lawyer for tax reasons, succession and confidentiality.
Regards
Alex

A copy of the email is attached as Exhibit 23.

72.   In the second email, Mr. Palencia asked Mr. Binaggia to send instructions to transfer $2

million to a company called Il Cavallo (a company that Mr. Della Polla owned). Mr.

Palencia explained he had to "pass it to the lawyers in NY as soon as possible."  A copy of

the translated email is below:

From: Alexander Palencia <apalencia@yahoo.com>
Date: June 11, 2013 22:19:48 GMT + 2
To: Pedro Binaggia <pedrobinaggia@gmail.com>
Subject: Il Cavallo instructions

Hello Pedro
please send the instructions to transfer the 2 MM to Il Cavallo, I have to pass it to the lawyers in NY as soon as possible
slds

Alexander Palencia
m: + 1-305-726-4444
e: apalencia@yahoo.com

A copy of the email is attached as Exhibit 24.

73.   In the third email, Mr. Palencia sent to Mr. Binaggia and Mr. Della Polla a message with a memorandum attached.  Mr. Palencia explained the memorandum was designed to keep all of the "participants" in the Brooklyn Real Estate Deal informed of developments.  The memorandum provided a history of the project and the economics of the project, the development progress as of the date of the memorandum, and general news about the Brooklyn real estate market.  The update specifically identifies the properties at 420 and 430 Carroll Street, 300-318 Nevis Street and explains that they are rented.  The update further indicates that "[w]ork is underway to acquire two additional properties: 201/225 Third Street (Chaves) and 327/335 Bond Street (Tinneny).  A copy of the translated email is below:

From: Alexander Palencia <apalencia@yahoo.com>
Date: June 11, 2013 02:06:40 GMT + 2
To: Pedro Binaggia <pedrobinaggia@gmail.com>, Fabrizio Della Polla <fdp.servinaca@gmail.com>
Subject: Gowanus Update June 2013

Hello Pedro,

> Attached I am sending you a first email that I hope to send periodically from now on.
> The idea and based on what we discussed is to keep all the participants of what is happening in the business and the area.
> Please give it a read and tell me about it.
> Regards
> Alex

A copy of the email is attached as Exhibit 25.

74.   Once again, sending this memorandum to Mr. Della Polla as a "participant" in the Brooklyn Real Estate Deal investment with the purpose of keeping him informed "of what is happening in the business and the area" unequivocally reflected the fact that the two men were investing jointly as partners.

75.   Prior to March 2014, Mr. Palencia began the process of restructuring the Brooklyn Real Estate Deal ownership— purportedly to make it more tax efficient.   In this regard, Mr. Palencia met and solicited advice from lawyers and accountants.

76.   As part of this effort and starting in March 2014 and continuing through April 2014, Mr. Palencia sent a series of emails to Mr. Della Polla which provide additional direct and irrefutable evidence that Mr. Palencia knew Mr. Della Polla was an investor in the Brooklyn Real Estate Deal.

77.   On March 26, 2014, Mr. Palencia met with a lawyer regarding the Brooklyn Real Estate Deal.   After the meeting, he sent an email to Mr. Binaggia and Mr. Della Polla about the meeting.   According to Mr. Palencia, the lawyer asked several questions regarding the structure of the investment, including whether Mr. Fabrizio's Nevis company and trust had been formed yet.   A copy of the translated email is below:

   From: Alexander Palencia <apalencia@yahoo.com>

Date: March 26, 2014, 19:11:22 GMT + 1
To: Pedro Binaggia <pedrobinaggia@gmail.com>
Cc: Alexander Palencia <apalencia@yahoo.com>, Fabrizio Della Polla
<fdp.servinaca@icloud.com>
Subject: Blackforest Reunion with Barry / Ron 03-26-2014

Hello Pedro,
how are you?
I just had a conference with Barry and Ron (attorney) to finish organizing the
Brooklyn thing, several questions aired:

     1.   Has Nevis de Fabrizio's company been formed yet? and What is
     the status of the formation of his trust.

     2.   For the 20% that will be charged on the 6MM of Mirabel
     (whatever that generates)
        It is spoken as 6/7 of the portion of Zucchero, since for new effects
        Mirabel will not exist. 1 MM trained on your part and 6 on
        Mirabell's part.  Does that composition follow or is there an internal
        change?
        Of the company that collects 20% of the profit generated by the
        6MM, 1/3 is you.  The suggestion is that it is not the same Nevis
        company, Zucchero.  It can be in your name or if you have another
        company, please let me know

Regards
Alex

A copy of this Email is attached as Exhibit 26.

78.   On April 7, 2014, Mr. Palencia sent an email to Mr. Binaggia and Mr. Della Polla to follow

up on the company and the trust.  Mr. Palencia instructed Mr. Binaggia not to forget Mr.

Della Polla's company name and information for the structure of the Brooklyn Real Estate

Deal.  He added trust is also required.  A copy of the translated email is below:

From: Alexander Palencia <apalencia@yahoo.com>
Date: April 7, 2014, 20:11:19 GMT + 2
To: Pedro Binaggia <pedrobinaggia@gmail.com>
Cc: Fabrizio Della Polla <fdp.servinaca@gmail.com>
Subject: Brooklyn

Hello Pedro,

THE LAW OFFICE OF STEPHEN JAMES BINHAK, P.L.L.C.,
1221 Brickell Ave., Suite 2010, Miami, FL  Tel. (305) 361.5500, Fax (305) 428.9532

Please don't forget Fabrizio's company name and info for the Brooklyn structure. Trust is also required.

Slds
Alexander Palencia
m: + 1-305-726-4444
e: apalencia@yahoo.com

A copy of this Email is attached as Exhibit 27.

79.   On April 14, 2014, a lawyer for the investment group sent a term sheet to Mr. Palencia. Attached to the email was a summary of terms for the Amended and Restated Operating Agreement for Blackforest Real Estate Advisors, LLC— the top level entity that Mr. Palencia and Mr. Della Polla used to invest in the Brooklyn Real Estate Deal .

80.   According to this term sheet, "Palencia Fabrizio Newco, a Delaware, LLC" was to own a 53.0971% membership interest in Blackforest Real Estate Advisors, LLC.  This ownership interest was based on "Palencia Fabrizio Newco's" initial capital investment of $7,742,942. Alex Palencia and "Fabrizio Newco, a Nevis international business company" were the proposed members of Blackforest Real Estate Advisors, LLC.  Of, course, these comments explicitly confirm that Mr. Della Polla and Mr. Palencia were partners.  Mr. Palencia sent this email on to Sergio Parra and Mr. Della Polla, and asked both for their comments. A copy of the translated email is below:.

From: Alexander Palencia <apalencia@yahoo.com>
Date: April 14, 2014, 20:22:45 GMT + 2
To: Sergio Parra <sparra66@gmail.com>
Cc: Fabrizio Della Polla <fdp.servinaca@gmail.com>
Subject: Fwd: Blackforest

Dear Sergio,

Attached I sent you the Term Sheet with which the "Operating Agreement" of Blackforest Real Estate Advisors LLC will be prepared. I would like to hear your opinion on it.
You let me know and we communicate via Skype.
Regards
Alexander Palencia
m:
+ 1-305-726-4444
e: apalencia@yahoo.com

Begin forwarded message:
From: "Kriss, Ronald A."
Subject: Blackforest
Date: April 14, 2014 at 10:57:45 AM EDT
To: 'Alexander Palencia' <apalencia@yahoo.com>
Cc: "Barry M. Brant", "Martinez, Daniel", Andrew Leonard

PRIVILEGED AND CONFIDENTIAL

Alex, I'll call shortly, but attached is a revised version of the Summary of Terms, reflecting the terms we discussed, and the elimination of the convertible note.

Ron

A copy of this Email is attached as Exhibit 28.

81.   On April 17, 2014, Mr. Palencia sent an email to Mr. Della Polla and Mr. Binaggia.  In the email, Mr. Palencia passed on advice from an international tax consultant regarding how Blackforest Real Estate Advisors, LLC's profits from the Brooklyn Real Estate Deal would be taxed in different jurisdictions.   The advice specifically addresses how a Venezuelan citizen would be taxed— which is significant because Mr. Della Polla is Venezuelan.   The relevant portions of the email say:

From: Alexander Palencia <apalencia@yahoo.com>
Date: April 17, 2014, 13:01:05 GMT+2
To: Pedro Binaggia <pedrobinaggia@gmail.com>, Fabrizio Della Polla <fdp.servinaca@gmail.com>
Subject: Fwd:  Blackforest

Alexander Palencia
apalencia@yahoo.com
+1-305-726-4444

Begin forwarded message:

From: "Barry M. Brant" <brant@bpbcpa.com>
Date: April 17, 2014 at 0:55:13 EDT
To: 'Alexander Palencia' <apalencia@yahoo.com>, Ron Kriss <rkriss@STROOCK.COM>
Cc: "Martinez, Daniel" <dmartinez@stroock.com>, Andrew Leonard <aleonard@bpbcpa.com>, "Tereese C. Filos" <tfilos@bpbcpa.com>, "Tatiana G. Haro" <THaro@bpbcpa.com>, Eileen Abraham <eabraham@bpbcpa.com>
Subject: RE: Blackforest

Barbados and the US have an income tax treaty. Nevis and the US do not. However, that treaty won't really matter since profits from the Brooklyn project will al be earned in the US and thus subject to US tax.  Since we are electing to classify the Nevis (or Barbados) company as a transparent entity, the owners of such company (principally the trusts) are ultimately responsible for the tax on the US source income.   In the event that the Venezuelan owners want to send profits back to Venezuela, there may be an advantage to use a Barbados company (since Barbados has a treaty with Venezuela) but my understanding is that the Venezuelans wanted to keep all funds offshore.   In the event that the trust structure were to ever unwind, and US profits were to be taken back to Venezuela, then Barbados may be better than Nevis. Barbados has a minimum tax of 0.5% after tax credits from the US and a maximum tax of 2.5% with no tax on capital gains.   Let me know if you have any questions.  Thanks, Barry.

\* \* \*

Barry M Brant CPA | Director of Tax, Consulting and International Services
Berkowitz Pollack Brant Advisors and Accountants

\* \* \*

From: Alexander Palencia [mailto:apalencia@yahoo.com]
Sent: Wednesday, April 16, 2014 6:54 PM
To: Ron Kriss; Barry M. Brant
Cc: Martinez, Daniel; Andrew Leonard

Subject: Re: Blackforest

Dear Barry and Ron,
Is there a difference between using a Barbados vs a Nevis ??
Are there any special treatments between Barbados and the US?
Regards
Alex
Alexander Palencia
m:      +1-305-726-4444
e:      apalencia@yahoo.com

On Apr 14, 2014, at 10:57 AM, Kriss, Ronald A.
<rkriss@STROOCK.COM> wrote:

PRIVILEGED AND CONFIDENTIAL

Alex, I'll call shortly, but attached is a revised version of the Summary of
Terms, reflecting the terms we discussed, and the elimination of the
convertible note.
Ron
Ron Kriss
Stroock & Stroock & Lavan LLP
200 S. Biscayne Blvd., Suite 3100
Miami, FL 33131
Direct: 305.789-9393
Mobile: 305.323-9119
Fax: 305 416-2893
rkriss@stroock.com
www.stroock.com

                          * * *

-----Original Message-----
From: Alexander Palencia [mailto:apalencia@yahoo.com]
Sent: Monday, April 14, 2014 10:12 AM
To: Kriss, Ronald A.
Subject: Re: Follow up
Good morning Ron,
 I hope you had a wonderful weekend in NYC, I heard weather was nice.
Let try to talk later today, I will be available all day.
 Best regards
Alex
 Alexander Palencia
m:      +1-305-726-4444

THE LAW OFFICE OF STEPHEN JAMES BINHAK, P.L.L.C.,
1221 Brickell Ave., Suite 2010, Miami, FL  Tel. (305) 361.5500, Fax (305) 428.9532

e:        apalencia@yahoo.com

On Apr 9, 2014, at 12:59 PM, Kriss, Ronald A.
<rkriss@STROOCK.COM> wrote:
 Still working on it, Alex.
Ron
Ron Kriss
Stroock & Stroock & Lavan LLP
200 S. Biscayne Blvd., Suite 3100
Miami, FL 33131
Direct: 305.789-9393
Mobile: 305.323-9119
Fax: 305 416-2893
rkriss@stroock.com
www.stroock.com

* * *

-----Original Message-----
From: Alexander Palencia [mailto:apalencia@yahoo.com]
Sent: Wednesday, April 09, 2014 11:34 AM
To: Kriss, Ronald A.
Subject: Follow up
Good morning Ron,
I hope this email finds you well.
I just wanted to know if you had time to review last details so we can start
going over a revised term sheet.
Thank you
Alex
Alexander Palencia
m:        +1-305-726-4444
e:        apalencia@yahoo.com

A copy of this Email is attached as Exhibit 29.

82.    In addition to the lawyers, Manuel Candal (the accountant that Mr. Della Polla and Mr.

Palencia used for the Brooklyn Real Estate Deal) was also aware of the partnership.   In

October 2015, Mr. Palencia sent Mr. Candal a proposed structure for tax advice.   After

reviewing the file, without any prompting, Mr. Candal sent the email to Mr. Della Polla so

THE LAW OFFICE OF STEPHEN JAMES BINHAK, P.L.L.C.,
1221 Brickell Ave., Suite 2010, Miami, FL  Tel. (305) 361.5500, Fax (305) 428.9532

he would be in the loop.  In the prior email to Mr. Palencia, Mr. Candal specifically asks

about the partnership: "For that matter of your investment with FDP [Fabrizio Della Polla]

let me know the amounts corresponding to each one."  The translated emails says:

> To: Fabrizio Della Polla [fdp.servinaca@icloud.com]
> From: MCI [mci@taxand-pa.com]
> Sent: Fri 10/16/2015 7:40:03 PM (UTC)
> Subject: FW: Requirements & Doubts Candal- structure Nevins Street and
> Carroll Street
>
> For your information.
>
> Manuel Candal
> E. mcandal@taxand.com.ve
> T: +58 (212) 750 0095 Ext. 101
> F: +58 (212) 750 0099
>                                         * * *
> From: mci@taxand-pa.com
> To: apalencia@yahoo.com
> Subject: RE: Requirements & Doubts Candal- structure Nevins Street and
> Carroll Street
> Date: Fri, 16 Oct 2015 15:39:32 -0400
>
> Alexander
> Ok also please send me for each structure the historical purchase values of
> land and existing debts in any part of the structure.  For that matter of your
> investment with FDP let me know the amounts corresponding to each one.
> Happy weekend
>
> Manuel Candal
> E. mcandal@taxand.com.ve
> T: +58 (212) 750 0095 Ext. 101
> F: +58 (212) 750 0099
>                                         * * *
> From: apalencia@yahoo.com
> Subject: Re: Requirements & Doubts Candal- structure Nevins Street and
> Carroll Street
> Date: Fri, 16 Oct 2015 15:26:53 -0400
> To: mci@taxand-pa.com
>
> Manuel

Carroll's picture has an error, I just saw it and where it says 58% under Carroll Street Development, you should read 80%
In both cases the relationship is always 80/20. Being 80% on our side and 20% on the PMG side (the developer)
I do not have the rest of the material with me but during the weekend I will send it to you to answer the other points
Regards
Alex

Alexander Palencia
m: + 1-305-726-4444
e: apalencia@yahoo.com

On Oct 16, 2015, at 3:06 PM, MCI <mci@taxand-pa.com> wrote:
Good afternoon Alexander
I attach my questions to date:
CARROLL STREET:
1) In the context of the sheet please explain the difference of meaning between the triangle of Blackforest RE Adv LLC and square with circle inside Carroll Street Development LLC?
2) Please send me the document of Convertible Promissory Notes to FDP and Zuch.
3) Please send me the legal docs of the companies in 1).
4) Who has the property of the remaining 22% that is not seen in the sheet.
5) How do I fund your share?
6) Carroll Street Holdings that I understand is the owner of the land has not made the choice to tax as C-Corp?  The same question applies for the companies detailed in 1) above.
NEVINS STREET:
1) In the context of the sheet please explain the difference of meaning between the triangle of Blackforest RE Adv LLC and square with circle inside Carroll Street Development LLC?
2) Please send me the document of Convertible Promissory Notes to FDP and Zuch.
3) Please send me the legal docs of the companies in 1).
4) Who has the property of the remaining 22% that is not seen in the sheet.
5) How do I fund your share?
6) Nevins Street Holdings that I understand is the owner of the land has not made the choice to tax as C-Corp? The same question applies for the companies detailed in 1) above.

Manuel Candal
E. mcandal@taxand.com.ve

THE LAW OFFICE OF STEPHEN JAMES BINHAK, P.L.L.C.,
1221 Brickell Ave., Suite 2010, Miami, FL  Tel. (305) 361.5500, Fax (305) 428.9532

T: +58 (212) 750 0095 Ext. 101
F: +58 (212) 750 0099
\* \* \*
From: apalencia@yahoo.com
Subject: Nevins Street and Carroll Street structure
Date: Wed, 14 Oct 2015 16:37:01 -0400
CC: fdp.servinaca@gmail.com
To: mcandal@taxand.com.ve
Alexander Palencia
m: + 1-305-726-4444
e: apalencia@yahoo.com

A copy of this email is attached as Exhibit 30.

83.     On December 8, 2015, Mr. Candal followed up again with his pending questions from

October 16, 2015 about how to deal with Mr. Della Polla's (again "FDP" in the email)

interest in the investment.   To be sure, many of these questions specifically involved the

size of Mr. Della Polla's interest in the Brooklyn Real Estate Deal investment and how to

transfer it to a new corporate structure.   The translated email says:

> To: Alexander Palencia [apalencia@yahoo.com]
> Cc: Fabrizio Della Polla [fdp.servinaca@icloud.com]
> From: MCI [mci@taxand-pa.com]
> Sent: Tue 12/8/2015 6:23:41 PM (UTC)
> Subject: THIS REQUIRE IMMEDIATE ATTENTION- Requirements &
> Doubts Candal- structure Nevins Street and Carroll Street
> Alexander good afternoon, how are you.
> We are currently in the process of implementing the corporate structure of
> FDP.  In this sense, I will require some information from you, as soon as
> possible, to coordinate the transfer of the participation of FDP to the
> structure created in the companies namely:
> 1) NEVINS:
> a) I understand that the holding structure that we are creating for FDP will
> have a percentage of the Blackforest Nevins LLC partnership. What
> percentage of participation possess FDP?
> b) How we will justify the transfer of the participation that AP and NA
> have in Blackforest Nevins LLC that we will transfer you to a foreign FDP
> structure?  I can you send the Promissory Note that you told me about
> issued to FDP and Zucchero?

c) Because the amount we will transfer the participation held by FDP in Blackforest Nevins LLC.

d) Which American lawyers would be in charge of the transfer of the participation in Blackforest Nevins LLC to the FDP structure.

e) What payment support do you have in files about the funding made by FDP in the purchase of this asset?

f) Please send me a copy of the Blackforest Nevins LLC legal docs.

1) CARROL:

a) I understand that the holding structure that we are creating for FDP will have a percentage of the Blackforest RE ADV LLC partnership. What percentage of participation possess FDP?

b) How we will justify the transfer of the participation that AP and NA have in Blackforest RE ADV LLC that we will transfer you to a foreign FDP structure? I can you send the Promissory Note that you told me about issued to FDP and Zucchero?

c) Why amount we will transfer the participation held by FDP in Blackforest RE ADV LLC.

d) Which American lawyers would be in charge of the transfer of the participation in Blackforest RE ADV LLC to the FDP structure.

e) What payment support do you have in files about the funding made by FDP in the purchase of this asset?

f) Please send me a copy of the Blackforest RE Adv LLC legal docs.

Lastly, I understand that FDP has other real estate assets in NY in addition to above mentioned. If so, you can send me the same information for these, in addition to the papers of the companies involved.

Manuel Candal

E. mcandal@taxand.com.ve
T: +58 (212) 750 0095 Ext. 101
F: +58 (212) 750 0099
www.taxand.com.ve / www.taxand.com
* * *

A copy of this email is attached as Exhibit 31.

84.    Despite these requests from Mr. Candal, and the work of the lawyers, Mr. Palencia refused to complete the work to document Mr. Della Polla's interest in the new corporate structure. To this date, Mr. Della Polla does not know whether Mr. Palencia has restructured the Brooklyn Real Estate Deal investment, and if so, how.

85.    On March 31, 2016, Mr. Palencia sent to Mr. Binaggia and Mr. Della Polla a draft purchase agreement through which Third Street Holdings would sell parcels of land located at 131 Third Street, 132 Second Street, 140 Second Street, 134 Second Street and 137 Third Street in Brooklyn, New York.  A copy of the translated email follows:

> From: Alexander Palencia <apalencia@yahoo.com>
> Date: March 31, 2016 12:19:03 a. m. GMT + 2
> To: Fabrizio Della Polla <fdp.servinaca@icloud.com>
> Subject: Fwd: Third Street - Draft Purchase and Sale Agreement
>
> draft attached
>
> Alexander Palencia
> e: apalencia@yahoo.com
> M: +1(305)726-4444

A copy of this email is attached as Exhibit 32.

86.    Taken as a group, these contemporaneous emails leave no doubt that Mr. Della Polla and Mr. Palencia were jointly investing as partners in the Brooklyn Real Estate Deal.

**The Refinancings of the Nevins Street Property and the Carroll Street Properties After Purchase**

87.    After purchasing the properties located at 420-430 Carroll Street and at 300-344 Nevins Street, the principals of the Brooklyn Real Estate Deal engaged in various refinancing transactions.

The Carroll Street Properties:

88.    On September 29, 2014, the Berkshire Bank assigned its mortgage for the properties located at 420-430 Carroll Street to First Republic Bank.   A copy of the Assignment is attached as Exhibit 33.

THE LAW OFFICE OF STEPHEN JAMES BINHAK, P.L.L.C.,
1221 Brickell Ave., Suite 2010, Miami, FL  Tel. (305) 361.5500, Fax (305) 428.9532

89.   On September 30, 2014, the First Republic Bank loaned Carroll Street Holdings $1 million and took a mortgage for that amount against the properties located at 420-430 Carroll Street.  A copy of the mortgage is attached as Exhibit 34.

90.   Also on September 30, 2014, the First Republic Bank and Carroll Street Holdings, LLC executed "The Consolidated,Amended, and Restated Mortgage and Security Agreement." Through this document, the parties recognized the consolidation of the first $3 million loan (provided by The Berkshire Bank) and the second $1 million loan (provided by First Republic Bank), and Carroll Street Holdings, LLC granted First Republic Bank a $4 million mortgage against the properties located at 420-430 Carroll Street.  A copy of the Agreement is attache as Exhibit 35.

91.   As a result of these transactions, Carroll Street Holdings, LLC owed First Republic Bank $4 million secured by the properties located at 420-430 Carroll Street.

The Nevins Street Property:

92.   Effective March 13, 2015, Santander Bank loaned Nevins Street Holdings, LLC $10 million and took a mortgage for that amount against the property located at 300-344 Nevins Street in Brooklyn, New York.  Also effective March 13, 2015, Joyce A. Kjellegren assigned her mortgage against the property located at 300-344 Nevins Street in Brooklyn, New York to Santander Bank, N.A. "as administrative agent for itself and other lenders."  A copy of the Mortgage and the Assignment is attached as Exhibit 36.

93.   On February 28, 2017, Santander Bank assigned its $10 million mortgage against the property located at 300-344 Nevins Street in Brooklyn, New York to NGC Gowanus Portfolio, LLC.  A copy of the Assignment is attached as Exhibit 37.

THE LAW OFFICE OF STEPHEN JAMES BINHAK, P.L.L.C.,
1221 Brickell Ave., Suite 2010, Miami, FL  Tel. (305) 361.5500, Fax (305) 428.9532

94.     As a result of these transactions, NGC Gowanus Portfolio, LLC  had loaned a total of $10 million to Nevins Street Holdings, LLC against the property located at 300-344 Nevins Street in Brooklyn, New York.

Both Properties Together:

95.     On March 3, 2017, Carroll Street Holdings, LLC and Nevins Street Holdings, LLC borrowed $9 million from Gowanus Portfolio, LLC and secured the loan by granting Gowanus Portfolio, LLC a $9 million mortgage against the properties located at 420-430 Carroll Street and 300-344 Nevins Street in Brooklyn, New York. A copy of the Mortgage is attached as Exhibit 38.

96.     Also on March 3, 2017, Carroll Street Holdings, LLC and Nevins Street Holdings, LLC executed a (a) Promissory Note and (b) a "Consolidation, Extension. Modification, and Spreader Agreement" with NGC Gowanus Portfolio, LLC.   Through these documents, Carroll Street Holdings, LLC and Nevis Street Holdings, LLC: (a) recognized that they owed NGC Gowanus Portfolio, LLC a total of $23 million, and (b) granted NGC Gowanus Portfolio, LLC a $23 million mortgage against the properties located at 420-430 Carroll Street and 300-344 Nevins Street in Brooklyn, New York to secure the loan. A copy of the Agreement and Promissory Note are attached as Exhibit 39.

97.     Also on March 3, 2017, NGC Gowanus Portfolio, LLC assigned all of its interest in the "Consolidation, Extension. Modification, and Spreader Agreement" to Centennial Bank. A copy of the Assignment is attached as Exhibit 40.

THE LAW OFFICE OF STEPHEN JAMES BINHAK, P.L.L.C.,
1221 Brickell Ave., Suite 2010, Miami, FL  Tel. (305) 361.5500, Fax (305) 428.9532

98.  As a result, of these transactions, Centennial Bank has loaned Carroll Street Holdings, LLC and Nevis Street Holdings, LLC a total of $23 million against the properties located at 420-430 Carroll Street and 300-344 Nevins Street in Brooklyn, New York.

99.  On February 6, 2018, Centennial Bank assigned the "Consolidation, Extension. Modification, and Spreader Agreement" and the Promissory Note back to NGC Gowanus Portfolio, LLC.  As a result, NGC Gowanus Portfolio, LLC had taken back the loan and security interest.  A copy of the Agreement is attached as Exhibit 41.

100. On February 7, 2018, Carroll Street Holdings, LLC, sold the property at 420 Carroll Street Brooklyn, New York to 420 Carroll, LLC for $47,500,000.00. A copy of the deed is attached as Exhibit 42.

101. On February 7, 2018, NGC Gowanus Portfolio, LLC released its security interest against the property located at 300-344 Nevins Street in Brooklyn, New York through a "Partial Release of Mortgage."  A copy of the Partial Release of Mortgage is attached as Exhibit 43.

102. On February 7, 2018, 420 Carroll, LLC and CIT Bank executed a "Mortgage Assumption, Consolidation and Modification Agreement."  Through this Agreement, the parties agreed that 420 Carroll, LLC: (a) owed CIT Bank $25 million, and (b) granted CIT Bank a $25 million mortgage against the properties at 420-430 Carroll Street in Brooklyn, New York to secure the loan.  A copy of the Agreement is attached as Exhibit 44.

103. On January 31, 2020, 420 Carroll, LLC executed a "Building Loan Mortgage, Assignment of Leases and Rents and Security Agreement" with CIT Bank, N.A.  Through this loan, 420 Carroll, LLC borrowed an additional $4,730,136.00 from CIT Bank and granted a

THE LAW OFFICE OF STEPHEN JAMES BINHAK, P.L.L.C.,
1221 Brickell Ave., Suite 2010, Miami, FL  Tel. (305) 361.5500, Fax (305) 428.9532

mortgage against the properties at 420-430 Carroll Street in Brooklyn, New York to secure the loan. A copy of the Agreement is attached as Exhibit 45.

104. On January 31, 2020, 420 Carroll, LLC executed a "Project Loan Mortgage, Assignment of Leases and Rents and Security Agreement" with CIT Bank, N.A.  Through this loan, 420 Carroll, LLC borrowed an additional $1,519,864.00 from CIT Bank and granted a mortgage against the properties at 420-430 Carroll Street in Brooklyn, New York to secure the loan. A copy of the Agreement is attached as Exhibit 46.

105. On April 8, 2020, Nevins Street Holdings, LLC borrowed $7 million from First Republic Bank and secured the loan by granting a $7 million mortgage to First Republic Bank against the property located at 300-344 Nevins Street in Brooklyn, New York.  A copy of the Mortgage and Security Agreement is attached as Exhibit 47.

106. Although these transaction appear to have generated cash distributions at various points, Mr. Palencia has refused to confirm whether he or his entities received any money, and if so, how much and when it was received.

**Mr. Palencia Refuses to Acknowledge Mr. Della Polla's Investment**

107. Starting in 2018, Mr. Palencia started refusing to acknowledge Mr. Della Polla's investment in the Brooklyn Real Estate Deal.  Initially, he refused to provide information about the operations and profits.   Ultimately, he denied that Mr. Della Polla had any financial interest in the deal

108. In 2019, Mr. Della Polla met with Mr. Palencia in Madrid to address the problem.  The two men purportedly met to discuss how to restructure and document their investment partnership for the Brooklyn Real Estate Deal. At the meeting, Mr. Palencia said Mr. Della

THE LAW OFFICE OF STEPHEN JAMES BINHAK, P.L.L.C.,
1221 Brickell Ave., Suite 2010, Miami, FL  Tel. (305) 361.5500, Fax (305) 428.9532

Polla would have to trust him regarding the partnership.  Mr. Palencia (who had been under federal investigation for money laundering) explained that he was trying to protect Mr. Della Polla from being a target of the investigation.   Mr. Della Polla left the meeting believing that Mr. Palencia was making excuses and had no intention of honoring the men's partnership agreement.

109.  In April 2020, Mr. Della Polla was tired of being given the run around.  He directed his attorney to send a letter to Mr. Palencia's attorneys and demand an accounting of his investment in the Brooklyn Real Estate Deal and any other investments that Mr. Palencia made with Mr. Della Polla's money.   Mr. Della Polla's attorneys also requested any relevant legal documents regarding these investment.  The letter said:

> As you know, Mr. De La Polla is your majority business partner in all real estate business ventures with Property Management Group (PMG) and any of its subsidiaries or affiliates.

> Over time, Mr. De La Polla made funds available from the food business that the two of you ran.  You used this money to fund Mr. Della Polla's investment in the Carrol Street project and other projects.   Mr. De La Polla would like a full accounting of the funds he provided to this investment and any other investments from the point of investment to the current date.   In particular, Mr. De La Polla would like you to provide the books and records appropriate to describe and document:

>    1.  where the funds were originally deposited and where any remaining funds are currently held;

>    2.  any disbursements, investments, or distributions of any kind made from the originally deposited funds (with back-up);

>    3.  the relevant legal documents for any investments made with the originally deposited funds (inlcuding any mortgages or refinances of any property associated with the Carrol Street Project);

>    4.  the books and records of any business entity that was used for any business activity associated with the originally deposited funds (whether the entity remains open or closed);

THE LAW OFFICE OF STEPHEN JAMES BINHAK, P.L.L.C.,
1221 Brickell Ave., Suite 2010, Miami, FL  Tel. (305) 361.5500, Fax (305) 428.9532

     5.   an accounting of any gains or losses attributable to any investments made with the originally deposited funds.

To the extent that any to the extent that any profits or losses were reinvested in new ventures, please provide the same information for these new ventures.

We expect to receive this information within 15 days from the date of this letter. You or your representative may contact me regarding this request or with any questions you may have.

A copy of the letter is attached as Exhibit 48.

110.  .In response to this letter, Mr. Palencia's attorneys wrote back and denied there was any partnership or any investment.  Their letter says:

As we explained on the call, your client Fabrizio Della Polla is not a partner in any of Alexander Palencia's real estate ventures in New York or elsewhere, including in what your April 27, 2020 letter describes as the "real estate ventures with property management group (PMG) and any of its subsidiaries or affiliates." No evidence supports your client's assertion that such a partnership existed and no records exist of your client contributing funds or other benefits toward that effort. To be clear, Mr. Della Polla did not invest any funds in the "Carroll Street project and other projects" mentioned in your letter.  To the extent you or Mr. Della Polla have records proving otherwise or establishing the existence of a partnership along the terms described in your letter, we reiterate our earlier request for you to produce those records.

Accordingly, in light of the above and absent some other, yet-unspecified legal basis, Mr. Della Polla has no right of access to our client's "books and records" or to demand an accounting of investments he never made.  Please inform Mr. Della Polla that his request is denied.

A copy of the Letter is attached as Exhibit 49.

111.  Of course, the records and emails set forth above reveal that Mr. Palencia's lawyers' response is simply and demonstrably false.

112.  In light of this specific brush off, Mr. Della Polla realized he would need to bring this lawsuit to regain his rightful majority ownership of the real estate partnership, and his share of the relevant profits.

THE LAW OFFICE OF STEPHEN JAMES BINHAK, P.L.L.C.,
1221 Brickell Ave., Suite 2010, Miami, FL  Tel. (305) 361.5500, Fax (305) 428.9532

113.   Mr. Della Polla has met all conditions precedent to bringing this lawsuit.

## COUNT I
## FRAUD

114.   Mr. Della Polla reasserts the allegations in paragraphs 1-113 as though they were set forth here.

115.   Mr. Palencia made numerous false statements about Mr. Della Polla's participation in the Brooklyn Real Estate Deal.   In essence, Mr. Palencia falsely promised that he was using Mr. Della Polla's money as part of the two men's joint investment in the Brooklyn Real Estate Deal, and that Mr. Della Polla was a partner in the Brooklyn Real Estate Deal.

116.   In fact, Mr. Palencia knew that when he was telling Mr. Della Polla that he was using their money for a joint investment, Mr. Palencia was actually just taking the money with the intent to invest for himself only and not for Mr. Della Polla.   Further, Mr. Palencia knew that when he assured Mr. Della Polla the two men were partners, Mr. Palencia had excluded Mr. Della Polla from the relevant ownership entities to preclude him from being a partner in the deal.

117.   Mr. Palencia took these steps and made these statements to obtain Mr. Della Polla's money under false pretenses and to lull Mr. Della Polla into a false sense of security so he would not realize that Mr. Palencia defrauded him.

118.   Mr. Della Polla relied on these statements, and as a result, he has been injured.

119.   In this way, Mr. Palencia engaged in intentional misconduct (i.e., he had actual knowledge of the wrongfulness of his conduct and the high probability that injury or damage to the Mr. Della Polla would result and, despite that knowledge, intentionally pursued that course

THE LAW OFFICE OF STEPHEN JAMES BINHAK, P.L.L.C.,
1221 Brickell Ave., Suite 2010, Miami, FL  Tel. (305) 361.5500, Fax (305) 428.9532

of conduct, resulting in injury or damage) and gross negligence (i.e., his conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to Mr. Della Polla's rights).

WHEREFORE, Mr. Della Polla demands judgment in his favor and against Mr. Palencia for the damages that Mr. Palencia caused with his fraud, including punitive damages, plus interest and all other relief that the Court determines is appropriate.

**COUNT II**
**BREACH OF FIDUCIARY DUTY**

120. Mr. Della Polla reasserts the allegations in paragraphs 1- 113 as though they were set forth here.

121. Mr. Palencia solicited and accepted Mr. Della Polla's money to fund the investment in the Brooklyn Real Estate Deal, and agreed that the two men would be 80/20 partners in the deal.

122. As a partner, Mr. Palencia owed a fiduciary duty to Mr. Della Polla, and this fiduciary duty required Mr. Palencia to treat Mr. Della Polla in the utmost good faith, fairness, and honesty.

123. Mr. Palencia breach this fiduciary duty to Mr. Della Polla by either never formally including Mr. Della Polla in the partnership or by subsequently ousting Mr. Della Polla from the partnership.  In either case, Mr. Palencia wrongly deprived Mr. Della Polla of the benefits of the partnership, and repeatedly lied about his conduct to Mr. Della Polla.

124. In this way, Mr. Palencia engaged in intentional misconduct (i.e., he had actual knowledge of the wrongfulness of his conduct and the high probability that injury or damage to the

Mr. Della Polla would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage) and gross negligence (i.e., his conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to Mr. Della Polla's rights).

WHEREFORE, Mr. Della Polla demands judgment in his favor and against Mr. Palencia for the damages that Mr. Palencia caused with his breach of fiduciary duty, including punitive damages, plus interest and all other relief that the Court determines is appropriate.

## COUNT III
## NEGLIGENT MISREPRESENTATION

125.  Mr. Della Polla reasserts the allegations in paragraphs 1- 113 as though they were set forth here.

126.  Mr. Palencia made a series of false statements about Mr. Della Polla's participation in the Brooklyn Real Estate Deal.  In essence, Mr. Palencia falsely promised that he was using Mr. Della Polla's money as part of the two men's joint investment in the Brooklyn Real Estate Deal, and that Mr. Della Polla was a partner in the Brooklyn Real Estate Deal.

127.  In fact, Mr. Palencia knew or should have known that when he was telling Mr. Della Polla that he was using their money for a joint investment, Mr. Palencia was actually just taking the money with the intent to invest for himself only and not for Mr. Della Polla.  Further, Mr. Palencia knew or should have known that when he assured Mr. Della Polla the two men were partners, Mr. Palencia either intended to exclude Mr. Della Polla or had actually excluded Mr. Della Polla from the relevant ownership entities to preclude him from being a partner in the deal.  In this way, at a minimum, Mr. Palencia acted negligently.

128. Mr. Palencia took these steps and made these statements intending to induce Mr. Della Polla's to provide money under false pretenses and to lull Mr. Della Polla into a false sense of security so he would not realize that Mr. Palencia defrauded him.

129. Mr. Della Polla justifiably relied on these statements, and as a result, he has been injured.

130. In this way, Mr. Palencia engaged in gross negligence (i.e., his conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to Mr. Della Polla's rights).

WHEREFORE, Mr. Della Polla demands judgment in his favor and against Mr. Palencia for the damages that Mr. Palencia caused with his negligent misrepresentation, including punitive damages, plus interest and all other relief that the Court determines is appropriate.

## COUNT IV
## BREACH OF PARTNERSHIP AGREEMENT

131. Mr. Della Polla reasserts the allegations in paragraphs 1- 113 as though they were set forth here.

132. Mr. Palencia agreed to participate in a partnership with Mr. Della Polla for the Brooklyn Real Estate Deal.  In essence, Mr. Palencia promised that he was using Mr. Della Polla's money as part of the two men's joint investment in the Brooklyn Real Estate Deal, and that Mr. Della Polla was an 80% partner and Mr. Palencia was a 20% partner in the Brooklyn Real Estate Deal.

133. Mr. Palencia breached the partnership agreement by failing to record Mr. Della Polla's ownership in the Brooklyn Real Estate Deal, by failing to distribute profits when they came

to the partnership, and by falsely claiming that Mr. Della Polla was not a partner in the Brooklyn Real Estate Deal.

134. Mr. Palencia's breach of the partnership agreement has caused Mr. Della Polla damage.

     WHEREFORE, Mr. Della Polla demands judgment in his favor and against Mr. Palencia for the damages that Mr. Palencia caused through his breach of the partnership agreement, plus interest and all other relief that the Court determines is appropriate.

## COUNT V
## DECLARATORY RELIEF

135. Mr. Della Polla reasserts the allegations in paragraphs 1- 113 as though they were set forth here.

136. Mr. Palencia agreed to participate in a partnership with Mr. Della Polla for the Brooklyn Real Estate Deal.  In essence, Mr. Palencia promised that he was using Mr. Della Polla's money as part of the two men's joint investment in the Brooklyn Real Estate Deal, and that Mr. Della Polla was an 80% partner and Mr. Palencia was a 20% partner in the Brooklyn Real Estate Deal.

137. Through his lawyers, Mr. Palencia has informed Mr. Della Polla that he is not a partner in the Brooklyn Real Estate Deal and that he did not invest:

    As we explained on the call, your client Fabrizio Della Polla is not a partner in any of Alexander Palencia's real estate ventures in New York or elsewhere, including in what your April 27, 2020 letter describes as the "real estate ventures with property management group (PMG) and any of its subsidiaries or affiliates." No evidence supports your client's assertion that such a partnership existed and no records exist of your client contributing funds or other benefits toward that effort. To be clear, Mr. Della Polla did not invest any funds in the "Carroll Street project and other projects" mentioned in your letter.

THE LAW OFFICE OF STEPHEN JAMES BINHAK, P.L.L.C.,
1221 Brickell Ave., Suite 2010, Miami, FL  Tel. (305) 361.5500, Fax (305) 428.9532

138. Mr. Della Polla is in doubt about whether a partnership agreement exists, and if so, what are his rights under the partnership agreement.

139. Consequently, Mr. Della Polla and Mr. Palencia have a bona fide dispute, and there is an actual and present need for a declaration regarding Mr. Della Polla's status with regard to the partnership agreement.

WHEREFORE, Mr. Della Polla demands judgment declaring that he is a partner in the Brooklyn Real Estate Deal, and that he is entitled to 80% of any profits associated with this investment, and all other relief that the Court determines is appropriate.

## COUNT VI
## EQUITABLE ACCOUNTING

140. Mr. Della Polla reasserts the allegations in paragraphs 1- 113 as though they were set forth here.

141. Mr. Palencia agreed to participate in a partnership with Mr. Della Polla for the Brooklyn Real Estate Deal.  In essence, Mr. Palencia promised that he was using Mr. Della Polla's money as part of the two men's joint investment in the Brooklyn Real Estate Deal, and that Mr. Della Polla was an 80% partner and Mr. Palencia was a 20% partner in the Brooklyn Real Estate Deal.

142. As a result of this partnership, Mr. Palencia had a fiduciary duty to Mr. Della Polla to keep him informed of all partnership  investments and the results of the partnership investments.

143. The contract between Mr. Palencia and Mr. Della Polla involves extensive and complicated accounts and it is not clear that the remedy at law is as full, adequate and expeditious as it is in equity.

144. Mr. Della Polla is entitled to a formal accounting of the partnership affairs, and the best way to provide the formal accounting is for the Court to appoint a special master to perform the accounting.

WHEREFORE, Mr. Della Polla demands that the Court appoint a Special Master to perform a formal accounting of the Brooklyn Real Estate Deal and to report the results to Mr. Della Polla, and all other relief that the Court determines is appropriate.

**Mr. Della Polla demands a trial by jury on all issues in this lawsuit.**

Dated:  July 31, 2020

Respectfully submitted,

**THE LAW OFFICE OF STEPHEN JAMES BINHAK, P.L.L.C.**
*Counsel for Fabrizio Della Polla*
1221 Brickell Ave., Site 2010
Miami, Florida  33131
Telephone: (305) 361-5500
Facsimile:  (305) 428-9532

By: _____ /s/ Stephen James Binhak _____
        Stephen James Binhak, Esq.
        Florida Bar No. 0736491
               binhaks@binhaklaw.com